```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA
```

| | | |
|---|---|---|
| HARMS FARMS TRUCKING, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CV3185 |
| | ) | |
| v. | ) | |
| | ) | |
| WOODLAND CONTAINER, and | ) | MEMORANDUM AND ORDER |
| KAWASAKI MOTORS MANUFACTURING | ) | |
| CORP. U.S.A., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This case is submitted for final resolution by the undersigned on stipulated facts.[1]  The plaintiff, Harms Farms Trucking, Inc. ("Harms Farms"), claims defendant Kawasaki Motors Manufacturing Corp., U.S.A. ("Kawasaki"), owes Harms Farms for freight charges associated with transporting 90 loads of pallets from defendant Woodland Container Corporation ("Woodland") to Kawasaki's facilities at Lincoln, Nebraska.  Harms Farms obtained a default judgment against Woodland, the consignor, on August 15, 2006 (filing 59; filing 73 (stipulated facts), ¶ 3), but is also pursuing judgment and recovery against Kawasaki, the consignee of the shipments, under theories of implied contract, consignee liability, and unjust enrichment.

Kawasaki denies that it owes Harms Farms for the shipment, claiming no express or implied contract existed between Harms Farms and Kawasaki, any claim for recovery on the theory of unjust enrichment fails because Kawasaki did not receive a benefit for which it did not pay, and Harms Farms is equitably estopped from recovering against Kawasaki.

For the reasons discussed herein, judgment shall be entered in favor of Harms Farms.

---

[1] See filing 10, "Consent to Exercise of Jurisdiction by a United States Magistrate Judge," and 28 U.S.C. § 636(c).

FINDINGS OF FACT

Kawasaki entered into an oral contract with Woodland to supply and deliver wood pallets to Kawasaki.  Woodland, in turn, entered into an oral contract with Harms Farms to ship freight from Woodland to defendant Kawasaki at an agreed upon rate.  Harms Farms is a trucking business owned and operated by Bobby Harms and his wife, Tracey Harms.  Harms Farms was not a party to the contract between Kawasaki and Woodland, and Kawasaki was not a party to the contract between Harms Farms and Woodland.

The bills of lading evidencing the shipments from Woodland to Kawasaki identified Harms Farms as the carrier, Woodland as the consignor, and Kawasaki as the consignee.  Approximately 90 shipments of pallets were made by Harms Farms to Kawasaki's plant in Lincoln, Nebraska between January 1, 2005 and March 23, 2005.  The freight charges for these shipments totaled $29,823.15.  Harms Farms never entered into any oral or written agreements with Kawasaki regarding the freight it was hauling for Woodland, and did not send Kawasaki a copy of the bills of lading for the freight before this lawsuit was filed.  However, a copy of the bill of lading for each of the 90 shipments was presented to Kawasaki and signed on its behalf at the time of delivery.  The bills of lading were not marked "prepaid," and contained no other language indicating that Harms Farms' shipping charges were paid by Woodland.  Filing 74 (supplemental index), ex. 1.

Woodland began experiencing financial problems, and Bobby and Tracey Harms were aware of these problems as early as August 2004.  Bobby Harms suspected Woodland would not be in business much longer.  During the last quarter of 2004, Woodland's payments for shipping arrived slowly--freight charges for

shipments made in 2004 remained unpaid until 2005. Nonetheless, Bobby Harms wanted to continue a shipping relationship with Woodland. He considered securing payment for shipments by placing a lien on loads hauled for Woodland to and from Nebraska, but he never did so. As to Kawasaki specifically, Harms Farms considered billing Kawasaki directly for the Woodland deliveries, an arrangement it had previously done with other consignees. It discussed this option with a Woodland plant manager, but never mentioned the proposal to Kawasaki and never directly billed Kawasaki. Instead, despite Woodland's slow payment history and its known financial problems, Harms Farms continued to ship loads for Woodland to Kawasaki during the first quarter of 2005 on a "cash only" basis; that is, Harms Farms verbally informed Woodland that freight would not be delivered by Harms Farms until it received a check in payment of the freight charges.

The relationship between Harms Farms and Woodland ended in March 2005. Woodland had presented a check dated March 15, 2005 to Harms Farms as payment for freight charges. However, the check was later returned unpaid for insufficient funds. As a result, Harms Farms stopped shipping freight for Woodland, the last such shipment occurring on March 23, 2005.

The freight charges incurred by Harms Farms for shipments from Woodland to Kawasaki from January until March 23, 2005 totaled $29,823.15. However, Woodland never paid any part of this amount owed. Harms Farms never told Kawasaki that a Woodlands check was returned for insufficient funds and failed to notify Kawasaki of the unpaid freight charges until April 19, 2005. By then, Kawasaki had been billed by Woodland for the $29,823.15 in freight charges, and had paid Woodland for $27,851.30 of those charges. Upon notice that Woodland was not

paying Harms Farms, Kawasaki paid Harms Farms (through its counsel) the remaining $1,971.85.  Accordingly, Kawasaki has paid $29,823.15 for the freight charges on 90 shipments made by Harms Farms from Woodland to Kawasaki, but Harms Farms received only $1,971.85 of those payments.

Harms Farms filed suit for recovery of the freight charges against Woodland and Kawasaki on June 21, 2005; Kawasaki filed a cross claim against Woodland.  Harms Farms obtained a default judgment against Woodland in the amount of $34,690.69--the unpaid freight charges for 95 shipments made by Harms Farms for Woodland, 90 of which were the deliveries to Kawasaki with freight charges totaling $29,823.15.  Filing 59.  However, Woodland was statutorily dissolved on April 14, 2006 for failure to make annual renewals, and no payment has been made on Harms Farms' default judgment against Woodland.  Filing 48, (Declaration), ¶ 4.

There are 103 unpaid invoices from Woodland to Kawasaki, totaling $91,256.81, but Kawasaki claims it is entitled to several set offs against the invoiced amounts and is withholding payment to Woodland.  Kawasaki has sought a default judgment against Woodland, and has included Harms Farms' unpaid freight charges in calculating Kawasaki's total damages.  Filing 29, ex. 1 (Neal affidavit); filing 74, (supplemental index), ex. 4. Kawasaki claims that if it recovers the $34,690.69 from Woodland, it will redistribute the funds directly to Harms Farms.

CONCLUSIONS OF LAW

The pivotal question in this case is which company, Harms Farms or Kawasaki, must accept the risk and bear the burden of attempting to collect the unpaid freight charges from Woodland. Both Harms Farms and Kawasaki contracted with Woodland, but no express contract existed between Harms Farms and Kawaskai.

Harms Farms claims Kawasaki, as consignee, is liable for the freight charges by operation of law because it accepted delivery of shipments. This doctrine existed at common law, and arises from three Supreme Court cases: <u>Pittsburgh, C., C. & St. L. Ry. Co. v. Fink</u>, 250 U.S. 577, 581 (1919); <u>New York Central & H.R.R. Co. v. York & Whitney Co.</u>, 256 U.S. 406 (1921); and <u>Louisville & N.R. Co. v. Central Iron & Coal Co.</u>, 265 U.S. 59 (1924). "[I]f a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later." <u>Louisville & N.R. Co</u>., 265 U.S. at 70. See also <u>States Marine International, Inc. v. Seattle-First National Bank</u>, 524 F.2d 245, 248 (9th Cir. 1975); <u>Southern Pacific Co. v. Miller Abattoir Co.</u>, 454 F.2d 357, 359 (3d Cir. 1972); <u>Northwestern P.R. Co. v. Burchwell Co.</u>, 349 F.2d 497, 498 (5th Cir. 1965); <u>Empire Petroleum Co. v. Sinclair Pipeline Co.</u>, 282 F.2d 913, 916 (10th Cir. 1960); <u>New York C.R. Co. v. Transamerican Petroleum Corp.</u>, 108 F.2d 994, 997-98 (7th Cir. 1939); <u>Callaway v. Atchison, T. & S. F. Ry. Co.</u>, 35 F.2d 319, 320 (8th Cir 1929).

Though the consignor is considered primarily liable for the freight charges, a consignee also becomes obligated to pay for shipping when it accepts the goods delivered by the carrier. <u>States Marine</u>, 524 F.2d at 248. Thus, absent some agreement or defense which limits or modifies the long-established rules of

liability for freight charges between private parties, a carrier may seek recovery of shipping charges for delivered freight from either the consignor or the consignee.

> The carrier is free to demand payment in advance by the consignor, or it may decline to make delivery to the consignee until the freight charges are paid or guaranteed, or if delivery is made to the consignee without payment, the consignee is also liable for all freight charges.

Illinois Steel Co. v. Baltimore & O. R. Co., 320 U.S. 508, 513 (1944). See also Hilt Truck Lines, Inc. v. House of Wines, Inc., 207 Neb. 568, 299 N.W.2d 767 (1980)(holding carrier has two sources from which to seek payment of shipping charges: the consignor who shipped goods and who is generally primarily liable, and the consignee who received goods--both are liable for shipping charges as a matter of law).

It is undisputed that Harms Farms delivered and Kawasaki accepted the 90 shipments of pallets from Woodland. Though Kawasaki claims Harms Farms must obtain recourse and recovery from Woodland, absent a valid defense to Harms Farms' claim, Kawasaki is, by operation of law, also liable to Harms Farms for these freight charges.[2]

---

[2]Kawasaki relies on Fikse & Co. v. U.S., 23 Cl.Ct. 200, 202 (1991) to support its claim. Fikse is inapplicable to this action because the defendant in Fikse was the United States government, and shielded from liability by sovereign immunity. Fikse "emphasized that defendant in this action enjoys a unique status as the sovereign. Insofar as relevant here, the Government cannot be held liable for nonpayment of money unless the claim arises out of 'a particular provision of law.'" Fikse, 23 Cl. Ct. at 202 (quoting Merritt v. United States, 267 U.S. 338, 341 (1925)). Fikse noted "[w]ith respect to contractual liability, the waiver of immunity extends only to express or implied in fact contracts. Liability cannot be implied as a

Kawasaki claims Harms Farms is equitably estopped from recovering from Kawasaki because Harms Farms knew Woodland was experiencing financial difficulty, yet it continued to deliver Woodland shipments to Kawasaki, failed to promptly warn Kawasaki that Woodland could not be relied on to pay the freight, did not tell Kawasaki that a Woodland check was returned in mid-March of 2005 until April 19, 2005, and failed to directly bill Kawasaki for the freight charges.  Kawasaki claims that as a result of Harms Farms' actions, or lack thereof, it paid the freight charges to Woodland, and should not be required to pay those charges again.

Equitable estoppel can be raised as an affirmative defense to claims for recovery of freight charges from a consignee. <u>Southern Pacific Transportation Co. v. Campbell Soup Co.</u>, 455 F.2d 1219 (8th Cir. 1972).  In <u>Campbell Soup</u>, the carrier sued the consignee to collect freight charges for the delivery of certain merchandise.  The bill of lading accompanying the merchandise indicated that the freight charges were to be

---

matter of law merely because of the relationship of the parties."
<u>Id</u>.  A federal act "does not give a right of action against the
United States in those cases where, if the transaction were
between private parties, recovery could be had upon a contract
implied in law," and "the Court has not permitted recovery
against the United States on a theory of unjust enrichment, but
has required the existence of a contract express or implied in
fact."  <u>Id</u>. (citing <u>Merritt</u>, 267 U.S. at 341; <u>Sutton v. United
States</u>, 256 U.S. 575, 581 (1921)).
    Unlike the position of the United States as consignee in
<u>Fikse</u>, defendant Kawasaki is not a sovereign and can be held
liable for the freight charges by operation of law.  In the
absence of any defense to the claim, Kawasaki became obligated to
pay Harms Farms' freight charges, even in the absence of a
contract, when it accepted delivery of the shipments from
Woodland.

"prepaid."[3]  Accordingly, the consignee paid the consignor/shipper for the cost of the merchandise plus freight charges, but since the carrier was unable to collect the freight charges from the consignor/shipper, it asserted a claim against the consignee.

Campbell Soup held that when a carrier delivers shipments to a consignee under bills of lading indicating the freight charges were to be prepaid, and the consignee, in reliance on the "prepaid" notation, reimburses the consignor/shipper in full for the freight charges, the consignee is entitled to raise the defense of estoppel against the carrier when the carrier has unsuccessfully sought payment from the consignor/shipper. Campbell Soup Co., 455 F.2d at 1222.  See also C.A.R. Transp. Brokerage Co. v. Darden Restaurants, 213 F.3d 474, 478-79 (9th Cir. 2000)(holding that when shipment has been marked "prepaid" on the bill of lading and the consignee has already paid the consignor for the freight charges, the consignee is not liable to the carrier for payment of the freight charges); Consolidated Freightways Corp. v. Admiral Corp., 442 F.2d 56 (7th Cir. 1971)(holding the carrier was equitably estopped from recovering freight charges from the consignee because the consignee paid

---

[3] A bill of lading stamped "prepaid" indicates the shipper has paid the freight charges to the carrier before the carrier released the bill of lading.  Lee v. Arrowpac, Inc., 179 B.R. 10, 13 (D.P.R. 1995).  "In the shipping industry, a bill of lading acknowledging that freight has been paid normally means that the carrier has received payment of the freight charges from the shipper prior to release of the bills of lading."  Mediterranean Shipping Co. v. Elof Hansson, Inc., 693 F.Supp. 80, 83 (S.D.N.Y. 1988).

8

those charges to the consignor in reliance on the "prepaid" language of the bill of lading); Oak Harbor Freight Lines v. Sears Roebuck & Co., 420 F. Supp. 2d 1138, 1148 (W.D. Wash. 2006)("[W]hen the shipment has been marked "prepaid" on the bill of lading and the consignee has already paid the consignor for the freight charges, the consignee is not liable to the carrier for payment of the freight charges."); In re Penn-Dixie Steel Corp., 6 B.R. 817 (S.D.N.Y. 1980)(holding a consignee is not liable to carrier for payment of freight charges where shipment was accompanied by a bill of lading marked prepaid and consignee has already paid consignor); Southern Auto Sound, Inc. v. Consolidated Freightways, Inc., 510 So. 2d 1085 (Fla. Dist. Ct. App. 2d Dist. 1987)(holding where consignee relied upon misrepresentation that freight had been prepaid and paid freight charges directly to shippers, carrier was estopped from requiring consignee to pay freight charges). The consignee bears the burden of proving the elements of an estoppel defense. Campbell Soup Co., 455 F.2d at 1222.

Harms Farms' claim for recovery of freight charges arises under federal law. See Cincinnati, N. O. & T. P. Ry. Co. v. Rankin, 241 U.S. 319, 326-327 (1916). Accordingly, federal law governs whether the defendant is entitled to the equitable estoppel defense. Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 665 (8th Cir. 1995)(holding state law is inapplicable on questions of estoppel and tolling in cases where a federal claim is at issue).

> Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to [its] detriment.

9

Kosakow v. New Rochelle Radiology Associates, P.C., 274 F.3d 706, 725 (2d Cir. 2001)(relying on Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59 (1984).  See also Garfield, 57 F.3d at 665; Hilt Truck Lines, 207 Neb. at 573, 299 N.W.2d at 770.  Although silence "generally is not affirmative conduct that gives rise to a finding of equitable estoppel," (Garfield, 57 F.3d at 665), "where a party has a legal duty to speak, silence can constitute an affirmative 'misrepresentation.'"  Kosakow, 274 F.3d at 725 (interpreting equitable estoppel principles in an action arising under FMLA and ERISA law).  See also Int'l Harvester Credit Corp. v. Leaders, 818 F.2d 655, 659 (8th Cir. 1987)(applying Iowa law and holding "silence may be the basis of an estoppel claim where there is a duty to speak.").

There is no evidence that Harms Farms represented to Kawasaki, either through words or actions, that Kawasaki would not be held responsible for the freight charges upon Woodland's failure to pay.  The bills of lading presented by Harms Farms to Kawasaki for each shipment did not include the notation "prepaid," or any other comment or phrasing indicating Harms Farms would look solely to Woodland for payment of freight charges.  Harms Farms made no express statement upon which Kawasaki detrimentally relied.

Kawasaki claims Harms Farms' is barred from recovery because it knew of Woodland's poor financial outlook but it did not promptly notify Kawasaki and never asked for direct payment of freight charges from Kawasaki.  In other words, Kawasaki claims Harms Farms' silence lulled Kawasaki into paying Woodland rather than Harms Farms for the freight charges, and as a result,

Kawasaki now faces double exposure for these costs. Kawasaki's argument faces insurmountable hurdles.

First, there is no evidence that Harms Farms had any legal duty to notify Kawasaki of Woodland's impending financial problems. The bills of lading for the shipments served as basic transportation contracts between the consignor (Woodland) and the carrier (Harms Farms), with the terms and conditions of the bill of lading binding Woodland and Harms Farms. <u>Atlantis Exp., Inc. v. Standard Transp. Services, Inc</u>. 955 F.2d 529, 531 n. 1 (8th Cir. 1992). No contractual relationship existed between Kawasaki and Harms Farms. There is no evidence Harms Farms knew or should have known Kawasaki was relying on Harms Farms for information concerning Woodland's ability to pay the freight charges, and no agency or other special relationship existed between Harms Farms and Kawasaki. Absent some showing of Harms Farms' legal duty to notify Kawasaki of Woodland's financial difficulties, its silence cannot be deemed a "misrepresentation" sufficient to establish the defense of estoppel. <u>Central States Trucking Co. v. Perishable Shippers Ass'n</u>, 765 F. Supp. 931, 936 (N.D. Ill. 1991)(holding carrier was not estopped from pursuing its freight charge claim against the shipper merely because it chose to do business with a shipper's association after it became aware of the association's financial difficulties; the carrier did not mark the bills of lading "prepaid," and made no misrepresentation to the shipper); <u>Southern California Edison Co. v. U.S.</u>, 43 Fed. Cl. 107, 122 (1999), rev'd on other grounds, 226 F.3d 1349 (D.C. Cir. 2000)(holding that where the plaintiff and the third party defendants had separate energy distribution contracts with the government, but no privity of contract or special relationship existed between the plaintiff and the third party defendants, the plaintiff was not estopped from raising belated challenges to the

refund allocation because it had no duty to alert the third-party defendants about its dissatisfaction).

 Kawasaki has also failed to prove Harms Farms knew Woodland would be unable or unwilling to pay the freight charges before Kawasaki sent its payments to Woodland; that is, Kawasaki has failed to prove its payments were made because Harms Farms concealed material information in its possession.  Prior to mid-March 2005, Woodland was paying, albeit slowly, its freight charge billings from Harms Farms.  I am not convinced that Woodland's slow payment practices alone were sufficient to place Harms Farms on notice that Woodland would ultimately stop paying freight charge billings altogether.  Harms Farms stopped transporting Woodland products on March 23, 2005, very shortly after a Woodland check was returned for insufficient funds. Though Harms Farms did not advise Kawasaki of the returned check until April 19, 2005, there is no evidence of when Kawasaki paid Woodland for the Harms Farms freight charges.  To the extent those payments were made before the Woodland check was returned for insufficient funds, which in turn signaled Woodland's actual inability to pay the charges, Kawasaki has failed to prove its payments were sent to Woodland because Harms Farms failed to warn Kawasaki that Woodland was insolvent.  Kawasaki has failed to prove that any or all of its payments to Woodland were made between the time of the returned check and April 19, 2005, and thus made in reliance on Harms Farms' concealment of material facts.  See e.g. Hilt Truck Lines, 207 Neb. at 574, 299 N.W.2d at 771 (holding that even as to bills of lading marked prepaid, the consignee failed to prove it relied on these notations where it paid the freight charges to the consignor before it received the goods or the bills of lading).

Kawasaki argues that a judgment in favor of Harms Farms would unfairly require Kawasaki to pay the freight charges twice. In support of this claim, Kawasaki cites to cases in which the bill of lading was marked "prepaid" and the consignee paid the consignor in reliance on that statement.  However, Harms Farms' bills of lading were not marked "prepaid," and there is no evidence of any other notation (or lack thereof) on the bills of lading which conveyed to a consignee in the industry that the consignor had paid the freight charges.  Under such circumstances, when Kawasaki paid Woodland, it took the risk that Woodland would not, in turn, pay Harms Farms.  Kawasaki could have protected itself by directly paying Harms Farms or insisting that all bills of lading were marked "prepaid" when signed at delivery.  By failing to take either of these precautionary measures, Kawasaki exposed itself to and assumed the risk of double liability for the freight charges on the shipments.  <u>Oak Harbor Freight Lines v. Sears Roebuck & Co</u>., 420 F. Supp. 2d 1138, 1151 (W.D. Wash. 2006)(holding Sears (the shipper) was required to pay carrier's freight charges even though Sears had already been paid the freight forwarder for these charges where the bills of lading were not marked "prepaid").  See also <u>Southern Pac. Transp. Co. v. Commercial Metals Co.</u>, 456 U.S. 336, 347-348 (1982)(holding consignor could not raise an estoppel defense to carrier's claim for freight charges where the consignor exposed itself to the risk of paying charges billed but uncollected by the carrier from the consignee; the consignor could have released itself from such liability by executing the nonrecourse clause in the bill of lading but failed to do so).  I therefore conclude Kawasaki has failed to prove Harms Farms is equitably estopped from collecting its freight charges from Kawasaki.

IT THEREFORE HEREBY IS ORDERED:

a.   Harms Farms is entitled to a judgment in its favor and against Kawasaki in the amount of $27,841.30.

b.   Judgment will be entered accordingly.

c.   The motion for summary judgment filed by Kawasaki, filing 64, is denied as moot.

DATED this 30th day of November, 2006.

>                   BY THE COURT:
>
>                   s/ *David L. Piester*
>                   David L. Piester
>                   United States Magistrate Judge